UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| KAELEN GRAS | * | CIVIL ACTION NO. 17-5668 |
| | * | |
| VERSUS | * | SECTION: "S"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE MARY ANN VIAL LEMMON |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Kaelen Gras, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 10) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 11) be GRANTED.

**Procedural Background**

Plaintiff applied for SSI on March 19, 2014, asserting a disability onset date of January 8, 1995. She alleged the following illnesses, injuries, or conditions:  Asperger's Syndrome, ADHD, OCD, Non-verbal Learning Disability, and Anxiety. On November 4, 2014, her claim was denied by the state agency. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 11, 2016. At that time, she formally waived her right to representation by an attorney or non-attorney advocate. On February 11, 2016, the ALJ issued an adverse decision. The Appeals Council denied review on April 13, 2017.

1

On June 12, 2017, Plaintiff filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 7, 8). The parties filed cross-motions for summary judgment. (Rec. Docs. 10, 11). Plaintiff is proceeding *pro se*.

## Evidence in the Record

*Medical Records*

From May 2004 through August 2005 (when Kaelen was 9 to 10 years old), Kaelen treated with Terry Johnson, PhD, and William Colomb, Jr., M.D., of the Mercy Family Center. R. at 322-353. She attended monthly individual therapy sessions of 60 minutes with Dr. Johnson, and Dr. Johnson would usually also meet with Kaelen's mother. Kaelen also attended group therapy sessions once or twice a month between June 2004 and March 2005, and then again in June 2005. She met with Dr. Colomb approximately every three months, and he prescribed Ritalin 30 mg and Zoloft 50 mg.  Kaelen's records from sessions with Dr. Johnson reflect a global assessment of functioning ("GAF") score of 65. The GAF scores in the records of her visits with Dr. Colomb varied, including 55-65, 60-40, 65 and 50.

The next medical record in Kaelen's file is dated August 4, 2010, when she began treating with Teche Action Clinic ("TAC"). R. at 264. She was noted to have appropriate judgment, good insight, proper orientation to time, place, and person, intact recent and remote memory, euthymic mood, and appropriate affect. R. at 265. The report also noted "minimal eye contact, drawing." R. at 265. She was prescribed Focalin 10 mg, Intuniv 1 mg, and Zoloft 100 mg. R. at 266.

Kaelen followed up with TAC on August 24, 2010. R. at 262. Obsessive thoughts were noted. R. at 262. She was also noted to have appropriate judgment, good insight, proper orientation to time, place, and person, intact recent and remote memory, euthymic mood, and appropriate

affect. R. a 262. Her prescription for Intuniv 1mg was discontinued and she was prescribed Daytrana 30 mg/9 hour patch, Focalin 10 mg, and Intuniv 3 mg.  R at 263.

Kaelen followed up for ADD/ADHD on November 22, 2010, at TAC. R. at 257. It was reported that she had attempted to discontinue Focalin, but had decompensated without it. R. at 257. It was reported that she was "obsessing about drawing, checking out books." R. at 257. It was noted that Kaelen is easily frustrated and distracted at home and Kaelen's teachers report that she is distracted and impulsive while at school. R. at 257. "ADD/ADHD Symptoms that are reported are mild," and further, "Kaelen seems to be better when taking medications." R. at 257. She was continued on Daytrana, Focalin, and Intuniv. R. at 259.

Kaelen began treating with Dr. Barbara Hamm at Magnolia Family Services ("Magnolia") on February 19, 2011. R. at 301. She was continued on Daytrana 30 mg, Focalin 10 mg, Intuniv 3 mg, and Zoloft 150 mg. R. at 301. Notes from the initial visit indicate that Kaelen made poor eye contact and made immature and socially inappropriate comments to the doctor, saying "whatever comes into her head." R. at 302. Dr. Hamm noted that Kaelen could benefit from intense services and that she was high risk for ongoing intense maladaptive behaviors, but with therapy there was higher potential for adaptive behaviors. R. at 303.

At her March 19, 2011, appointment with Dr. Hamm, Kaelen presented as calm and avoidant. R. at 300. Her situation at school was unchanged, and it was noted that she had problematic interactions at home due to Asperger's. R. at 300. Medications were continued. R. at 300. On April 23, 2011, Kaelen presented as calm and euthymic. R. at 299. It was reported that her grades had improved, there were no new problems, and she was doing well at home. R. at 299. Her medications were continued. R. at 299. At her June 21, 2011, and July 16, 2011, appointments,

a medication holiday was discussed. R. at 297-98. She was continued on Intuniv and Zoloft, but Daytrana and Focalin were discontinued. R. at 297-98.

On August 20, 2011, it was noted that there were "no problems thus far" at school. R. at 296. She was doing "ok" at home, but "requires quite a bit of daily interventions" with regard to social skills. R. at 296. Kaelen presented as calm but with a provocative attitude. R. at 296. Daytrana 30 mg, Focalin 10 mg, Intuniv 3 mg, and Zoloft 150 mg were continued. R. at 296. At her September 17, 2011, appointment with Dr. Hamm, it was reported that at school, Kaelen was distracted, not focused, and not doing homework. R. at 295. At home, she had been doing well, but with poor social interaction skills. R. at 295. She presented with poor eye contact and was disengaged. R. at 295. On October 15, 2011, it was noted she was doing "fair" at school but "struggling in math and Spanish." R. at 294. On November 12, 2011, she was reported to be doing "ok" at school and at home. R. at 293. At her January 1, 2012, appointment, it was reported Kaelen was doing fair at school and "ok" at home. R. at 245. A "vocal tic" was noted as a new problem. R. at 245. Dr. Hamm noted a euthymic mood, poor eye contact, and no thought disorder. R. at 245. At her February 11, 2012, appointment it was reported that Kaelen was doing well at school and her tics had decreased at home. R. at 244. At her April 14, 2012, medication management appointment, Kaelen was doing well behaviorally but not motivated at school. R. at 242. At her June 6, 2012, appointment for medication management, it was noted that Kaelen was doing well and had passed all her classes. R. at 240.

At her August 4, 2012, follow up, it was noted that Kaelen was doing well, that she had not been on Daytrana and Intuniv over the summer but would resume the medications. R. at 237. At her September 29, 2012, appointment it was noted that she had not been taking her Daytrana patch, but that she had been doing well in school. R. at 235. The Daytrana patch was discontinued,

and Kaelen was continued on Zoloft and Intuniv. R. at 236. On November 17, 2012, Kaelen followed up for Asperger's and ADD. It was noted that Kaelen was "doing well in school with good grades and no behavioral problems." R. at 232.

The record contains three psychological evaluations of Kaelen. The first was performed on January 9, 2012, by Megan Hattier, M.A., supervised by Johnny L. Matson, Ph.D. R. at 226. During testing and observation, Hattier noted that Kaelen displayed non-repetitive movements/behaviors, no abnormal preoccupation with objects, no insistence on sameness, no repetitive use of words, no abnormal use of phrasing. R. at 226. She noted Kaelen showed "some interest in the examiner's side of the conversation." R. at 226. During testing, Hattier reported that Kaelen followed instructions, was compliant and did not request breaks, and persisted when presented with difficult items. R. at 226. Hattier reported that Kaelen's scores placed her in the non-autistic range on the Childhood Autism Rating Scale. R. at 226. She noted that Kaelen has abnormalities in the following areas: moderate abnormality in relating to people, mild to moderate abnormality in emotional response, mild to moderate abnormality in activity level, and mild abnormality in general impressions. R. at 226.

The 2012 evaluation included several standardized assessments. An intellectual assessment was performed using the Stanford Binet Intelligence Scales – 5th Edition. R. at 227. For nonverbal IQ, she attained a standard score of 101 and for verbal IQ she attained a standard score of 90. R. at 227. It was concluded that Kaelen is functioning in the average range of intellectual functioning. R. at 227.

Kaelen's mother completed an Autism Spectrum Disorder-Diagnostic for Child Version for Kaelen, and based on her responses Kaelen scored a 51, which is in the pervasive development disorder- not otherwise specified range. R. at 227. The Vineland Adaptive Behavior Scale-2nd

Edition; Parent/Caregiver Rating Form was also administered. R. at 367. Kaelen's score was in the low deficit range. R. at 367. She was unable to follow three-part instructions, describe a short-term goal and what she needs to do to reach it, or write business letters. R. at 367. Her daily living skills were in the low range. R. at 367. Although she can care for minor cuts, use a microwave oven, and carryout complex tasks on a computer, she is not able to keep track of medications, sweep, mop, or vacuum. R. at 367. Socialization was also in the low-deficit range. R. at 367. Based upon her mother's ratings, Kaelen scored 117 on the Gilliam Asperger's Disorder Scale. R. at 367. This placed her in the high/probable range for Asperger's Disorder. R. at 367. The Krug Asperger's Disorder Index was administered and Kaelen's mother's ratings yielded a standard score of 68, which placed Kaelen in the "very low" range for Asperger's Disorder. R. at 367.

A Behavioral Assessment System for Children, 2nd edition (BASC-2) Parent Rating Scale was administered. Based on the ratings by Kaelen's mother, there were clinically significant elevations in the hyperactivity, externalizing problems, attention problems, behavioral symptoms index, social skills, activities of daily living, functional communication, and the adaptive skills composite. R. at 228. The Questions About Behavior Function was administered. R. at 228. The results indicated that Kaelen's verbal aggression serves both an escape and non-social function. R. at 228.

In summary, the Hattier/Matson evaluation concluded that Kaelen functions within the average range of intelligence. R. at 228. But socially, Kaelen has difficulty interacting with children of the same age and using nonverbal behavior. R. at 228. Kaelen has difficulty providing spontaneous speech and maintaining reciprocal conversation. R. at 368. Kaelen was diagnosed with Asperger's Disorder. R. at 368. A GAF of 65 was assigned. R. at 368.

A consultative psychological examination was performed on August 13, 2014, by William E. Fowler, Ph. D. R. at 277. Dr. Fowler noted that Kaelen was wearing a head set to protect against sound sensitivity and she was socially awkward. R. at 277. She was not taking any medication. R. at 278. Dr. Fowler administered the WAIS-IV, an individual test of intelligence. R. at 278. He noted that Kaelen did not appear to have trouble understanding or following instructions and that she worked at a steady pace and showed good attention and concentration, and sustained persistence. R. at 278. Her full scale score was 104. R. at 279. Dr. Fowler noted that while Kaelen could understand and carry out simple test instructions, her test results showed weakness in working memory. R. at 279. He noted a history of Asperger's and a nonverbal learning disorder. R. at 279. Dr. Fowler reported no overt evidence of impairment from ADHD, that OCD was not overtly evident, and she was not overtly anxious. R. at 279. However, he found Kaelen "does present as having an autism spectrum disorder and is socially awkward and has sensory problems and would likely have difficulty interacting with the public and with coworkers." R. at 279.

On November 3, 2014, state agency psychologist Laura Lochner, considered Kaelen's records and determined that Kaelen did not meet the requirements of Listing 12.10. R. at 71. In assessing the requirements of subparagraph B of Listing 12.10, Dr. Lochner concluded that Kaelen had mild restriction of activities of daily living; moderate difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation with extended duration. R. at 71. Dr. Lochner also assessed Kaelen's Residual Functional Capacity for the state agency on November 3, 2014. R. at 74. Dr. Lochner found Kaelen's ability to carry out detailed instructions was moderately limited, but her ability to carry out very short and simple instructions and to maintain attention and concentration for significant periods was not significantly limited. R. at 74. Dr. Lochner found Kaelen's ability to interact

appropriately with the general public was moderately limited. R. at 74. However, Dr. Lochner found her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was not significantly limited. R. at 74-75. Dr. Lochner concluded that Kaelen can perform simple and some complex tasks, can relate to others and work on a superficial basis, and can adapt to a work situation. R. at 75.

A third psychological examination was performed by Lynn Guidry, Ph.D. on February 4, 2016. This examination occurred after the hearing before the ALJ and shortly before the ALJ's decision was issued. It does not appear the 2016 evaluation was in the record before the ALJ, however, Kaelen's mother submitted the evaluation report with Kaelen's appeal and it was considered by the Appeals Council. R. at 5. According to Dr. Guidry's report, the purpose of the evaluation was to determine if Kaelen continued to be eligible for educational modifications. R. at 357. Dr. Guidry cited the 2012 psychological evaluation by Dr. Matson, noting that Kaelen has been assigned a full scale IQ of 95 Matson and an Asperger's Disorder Quotient of 87 = 117 (Standard Score). R. at 358. Dr. Guidry noted that "Kaelen was evaluated by interviewing her mother on the Gilliam Asperger's Disorder Scale (GADS)." R. at 357. Later, the report notes that Kaelen and her mother served as co-informants. R. at 359. This time the Asperger's Disorder Quotient was assessed as 63 = 105 (Standard Score). R. at 358. It was noted that a Standard Score of greater than 80 is "highly probable" and that both Kaelen's 2012 and 2016 test results were "highly probable." R. at 358. Dr. Guidry provided the following diagnosis:

> Autism Spectrum Disorder: For Social Communication, client is classified as Level 1: Has noticeable impairment in social communication; difficulty initiating social interactions; atypical responses to social overtures; decreased interest in social interactions. For Restricted Repetitive Behaviors client is classified as Level 1: Inflexibility in behaviors causes significant interference with functioning in one or

more areas; Problems of organizing and planning hampers independence. Without
Intellectual or Language Impairment.

R. at 359. There are three severity levels that are assigned in an autism spectrum disorder

diagnosis. Level 3 is "requiring very substantial support," Level 2 is "requiring substantial

support," and Level 1 is "requiring support."

*Testimony and Reports by the Claimant*

According to Kaelen's Disability Report, dated April 3, 2014, she did not attend special

education classes in school. R. at 167.

Kaelen's mother, Kathleen Gras, filled out a Function Report for Kaelen on May 31, 2014.

She reported that Kaelen has "[d]ifficulty following multi-step instructions, needs constant

reminders and supervision, great difficulty with general social interaction." R. at 174. Kathleen

reported that Kaelen has stopped all medication because she could never remember to take her

medication. R. at 176. She reported that Kaelen has no problem with personal care (bathing,

dressing, using the toilet, feeding herself). R. at 175. She reported Kaelen can prepare chicken

nuggets in the microwave, pizza, ramen noodles, and cereal. R. at 176. She can perform chores

like emptying the dishwasher and picking up after herself, but she needs constant reminders. R. at

176.

Kaelen also filled out a Function Report for herself. She reported going out for social

activities at least once a month. R. at 186. She also reported no problems with personal care and

that she is able to prepare frozen meals and cereal. R.at 183-184.

At the hearing before the ALJ on January 11, 2016, Kaelen, her mother Kathleen, and the

vocational expert Danielle Rhodes testified. R. at 30.  Kaelen was not represented by counsel or a

non-attorney advocate. The ALJ explained to Kaelen that she has a right to be represented. R. at

33-34. Kaelen stated that she wished to proceed without representation, and she signed a waiver of her right to representation. R. at 35.

Kaelen testified that she was in college and was in the process of transferring from Fletcher to Nichols. R. at 42. For her course schedule the previous semester, Kaelen went to school from 10:00 to 1:00 on Monday, Wednesday, and Friday. R. at 50-51. On Tuesday and Thursday she went from 4:20 or 5:00 p.m. to 8:00 p.m. R. at 51. She only received homework for her math class, and it would take her a little less than an hour to complete. R. at 51. She testified that she is in an "on-level" math class. R. at 52. Although she failed Algebra the first time she took it and got a C or D the second time and a C or D in financial math, she said that she passed her math class the previous semester with an A. R. at 52.

The ALJ asked Kaelen to explain why she could not work. R. at 43. Kaelen testified that she has trouble concentrating and comprehending directions. R. at 43. She said she had trouble organizing herself and would need to be told multiple times to do chores like taking dishes out of the dishwasher and picking up around the house. R. at 44. As an example of difficulty concentrating of focusing, Kaelen explained that when she was learning to drive she had "trouble with staying in front of the road" because she was used to looking out of the sides of the windows. R. at 45.

The ALJ asked Kaelen if she thought she could perform a simple job that required her to do the same thing over and over on a full time basis. R. at 51. She said she could probably do so. R. at 51. When Kaelen's mother testified, she contemplated a job that Kaelen would be able to perform: "something like inventory, where she could be independent, she could wear her headphones, and she wouldn't really have to interact especially overnight because she likes to stay up at night. . . . I know inventory they use a scanner or just to count, I think she could manage that,

10

not to have to do any math in there, I'm not sure if that would affect it. As long as they gave her detailed instructions and closely supervised her to train her . . . ." R. at 60.

The ALJ asked Kaelen if she had problems getting along with others. R. at 46. Kaelen explained that she is an introvert, that she only likes to go places with her friends, and that "sometimes I tend to intimidate people because I get really loud sometimes, but I don't have any control over the volume of my voice and that tends to turn people away, but overall I do have a bit of – I'm pretty good at making friends and I am well liked." R. at 46. She said she has acquaintances at school, and she has two friends that she spends most of her time with. R. at 47. She also said she tends "to make friends with a lot of my teachers because that can help a lot during semesters." R. at 47. She testified that she has not had any physical fights in the last two years, and when asked if she ever had verbal arguments, Kaelen explained that she and her friends sometimes discuss theories and get passionate about their thoughts, which sometimes escalates to shouting. R. at 47. She said they always make up in the end. R. at 47.

Kaelen also testified that she suffers from dyscalculia, which is "basically dyslexia but with numbers." R. at 52. She has trouble telling time on analog clocks, has trouble counting change, and her "map skills are pretty much useless." R. at 52. Kaelen's mother also noted that Kaelen has dyscalculia and said that Kaelen has trouble with numbers, money, and time. R. at 54. She explained that while Kaelen "has a large vocabulary and large intellect, she has difficulty . . . discussing ideas with other people or communicating with other people." R. at 54.

Kaelen testified that she does not receive medical treatment for her issues with concentration, comprehension, and organization. R. at 44. She said she had seen several therapists, but they did not seem to help much. R. at 44-45. She said she had not seen a therapist since 2014. R. at 45. She testified that she was not taking any medication to help her focus or concentrate. R.

at 46.  When Kaelen's mother testified, she explained that Kaelen had been taking Attention Deficit Disorder medication by a patch, but when she learned that Kaelen was removing the patch on the way to school, she decided that the medication was useless. R. ta 57.

Kaelen said that during a typical day, she spends time online talking to family or friends, playing video games, or playing with her dogs. R. at 47. She said that she loves role-playing games with good stories and beautiful backgrounds. R .at 47. She spends time on the internet or playing videogames all day when she is not going to school. R. at 48. She does not have trouble focusing on videogames. R. at 48.

Kaelen makes her own meals and showers every night. R. at 49. She only changes out of her pajamas if she is leaving the house. R. at 49. When asked if she had a driver's license, Kaelen testified that she did not have the "mental capacity to drive." R. at 42. The ALJ asked if she had ever tried to obtain a driver's license, but Kaelen said she had only gotten a learner's permit and that she took driver's ed, "but that was a disaster." R. at 42.

*Vocational Expert*

The ALJ asked the vocational expert to assume a hypothetical individual of Kaelen's age and education with the same lack of significant work history; with no exertional limitations; with a limitation to performing simple, routine tasks commensurate with an SVP level of 2 or less with no more than occasional changes in the work setting or routine; with a limitation of no more than occasional interaction with coworkers or supervisors; and with a limitation of no interaction with the public. R. at 62. The vocational expert testified that there would be work available. She listed as examples (1) DOT reference 209.687-026, which has an SVP of 2, light exertion level, with 422 jobs on the state level and approximately 69,000 nationally; (2) sorter, DOT reference 521.687-086, unskilled occupation with SVP of 2, light exertion level, with 1,400 jobs on the state level

and 127,000 on the national level; and (3) hand packer, with DOT reference 753.687-038, unskilled occupation with SVP of 2, light exertion level, with 1,900 jobs on the state level and 315,000 on the national level. R. at 62-63.

The ALJ next asked the vocational expert to consider the same person in hypothetical one, with the additional limitation that the person not be able to tolerate driving and would not be able to tolerate handling money. R. at 63. The vocational expert testified that the same three positions would continue to be applicable. R. at 63.

The ALJ next asked the vocational expert to consider the same person as in hypothetical two, but the individual would be off task at least 20 percent of the typical work day and/or would be absent at least three times per month due to exacerbations. R. at 63. The vocational expert testified that this person would not be able to perform any work in the national economy. R. at 64.

<u>**Decision of the Administrative Law Judge**</u>

The ALJ found that Kaelen has not engaged in substantial gainful activity since March 19, 2014, the application date. R. at 20. She found that Kaelen has the following severe impairments: Autism Spectrum Disorder and hyperkinetic syndrome/Attention Deficit Disorder ("ADD"). <u>Id.</u> Although Kaelen alleged psychosis/depression, obesity, thyroid condition, and polycystic ovary syndrome, the ALJ found these to be non-severe, noting that Kaelen is not currently alleging any symptoms of psychosis/depression, there is no indication that her obesity, thyroid condition, or polycystic ovary syndrome would have more than a minimal effect on an individual's ability to work. <u>Id.</u>

The ALJ next found that Kaelen does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1. R. at 21. The ALJ considered Kaelen's mental impairment under the requirements of listing 12.05. R. at 21. The ALJ determined that the requirements of paragraph A of the listing had not been met because Kaelen has no problem taking care of her own personal needs and is capable of taking standardized tests. R. at 21. The ALJ determined that the requirements of paragraph B of the listing had not been met because Kaelen does not have a valid verbal, performance, or full scale IQ of 59 or less. R. at 21. In so holding, the ALJ noted that although Kaelen had scored less than 59 in 2012,[1] that was long before the protective filing date and more recently, Kaelen's August 13, 2014, IQ assessment yielded an IQ score of 104. R. at 21. The ALJ determined that the requirements of paragraph C of the listing had not been met because Kaelen does not have a valid verbal, performance, or full scale IQ of 60 to 70. R. at 21. The ALJ determined that Kaelen does not meet the requirements of Paragraph D. R. at 21. To meet the requirements of paragraph D, the claimant must have an IQ score of 60-70 and the claimant must meet two of the following: marked difficulty in activities of daily living, marked difficulty in social functioning, marked difficulty in concentration, persistence, or pace; and repeated episodes of decompensation. R. at 21. The ALJ found the requirements of paragraph D have not been met. R. at 21. First, the ALJ found Kaelen has only a mild restriction in activities of daily living because she can take care of her personal needs although she is unable to obtain a driver's license. R. at 21. The ALJ found Kaelen has moderate difficulties in social functioning because although she displays anti-social behaviors, she gets along well with her mother and friends. R. at 21-22. The ALJ found Kaelen has moderate difficulties in concentration, persistence, or pace because she has difficulty following direction and finishing what she starts, but she is also able to spend all day

---

[1] The ALJ cites the Hattier/Matson report, but during that evaluation, Kaelen attained a standard score of 90 on her verbal IQ, and a full scale standard score of 95. The Court has not identified any IQ scores less than 70 assigned to Kaelen.

playing video games with long complex stories. R. at 22. The ALJ found no evidence that Kaelen has experienced any episodes of decompensation. R. at 21-22.

The ALJ next found that Kaelen has the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations:  She is limited to performing simple, routine tasks commensurate with an SVP level of two or less, with no more than occasional changes in work setting or routine, no more than occasional interaction with co-workers or supervisors, and no interaction with the public. She would also be limited to work that does not require driving or handling money as part of the work duties. R. at 22. The ALJ considered the testimony of Kaelen and her mother, as well as the Function Report filled out by Kaelen's mother, and the psychological evaluations of Hattier and Dr. Matson as well as Dr. Fowler. R. at 23-24.

The ALJ determined that Kaelen has no past relevant work. R. at 24. The ALJ determined that Kaelen was a "younger individual" because she was 19 on the date of application. R. at 24. The ALJ determined that Kaelen has at least a high school education and is able to communicate in English. R. 24. The ALJ determined that transferability of job skills is not an issue because Kaelen has no past relevant work. R. at 24. The ALJ determined that considering Kaelen's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Kaelen can perform. R. at 24. In so finding she considered the testimony of the vocational expert. R. at 25. The ALJ concluded that Kaelen has not been under a disability under the Act since March 19, 2014, the date her application was filed. R. at 25.

**Statement of Issues on Appeal**

Issue No. 1.    Whether the ALJ erred in considering claimant's diagnosis under listing 12.05 instead of listing 12.10.[2]

Issue No. 2.    Whether the ALJ erred in finding that claimant has received very little treatment for mental impairment in recent years.

Issue No. 3.    Whether the ALJ erred in finding significant jobs available for claimant without consideration of claimant's argument that she cannot live on her own and cannot drive, limiting her ability to travel for work.

**Analysis**

**I.    Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues de novo, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the

_____

[2] Kaelen cites as a fourth issue that the ALJ should have found her disabled under listing 12.10. The Court considers that issue as part of Issue No. 1.

record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

**II.    Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity

is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

I.    **Plaintiff's Appeal**.

Issue No. 1.    Whether the ALJ erred in considering claimant's diagnosis under listing 12.05 instead of listing 12.10.[3]

Kaelen contends that the ALJ erroneously considered her Asperger's diagnosis under listing 12.05, "intellectual disorder," instead of listing 2.10 "autism spectrum disorder." The Commissioner concedes that the ALJ considered the wrong listing, but argues that this mistake was harmless.

The ALJ's failure to consider a specific listed impairment only justifies remand if the error was not harmless. Hurst v. Colvin, 639 F. App'x 1018, 1021 (5th Cir. 2016). Thus, if substantial evidence supports the ALJ's decision, it must still be affirmed. Id.    In Hurst, the Fifth Circuit determined that "[a]lthough the ALJ failed to cite section 8.05 in her decision, she did cite considerable evidence that bolstered her conclusion that [claimant] 'does not have an impairment or combination of impairments that meets or medically equals the severity' of an impairment listed in Appendix 1." Id.  at 1021-22.

As the Commissioner points out, although the ALJ failed to consider listing 12.10, one of its requirements overlaps with a requirement of Listing 12.05. Listing 12.05 is satisfied if one of the following subparagraphs is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
> B. A valid verbal, performance, or full scale IQ of 59 or less; OR

---

[3] As noted, Kaelen cites as a fourth issue that the ALJ should have found her disabled under listing 12.10. The Court considers that issue as part of Issue No. 1.

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

*D.* A valid verbal, performance, or full scale IQ of 60 through 70, resulting in *at least two of the following:*

> *1. Marked restriction of activities of daily living; or*
> *2. Marked difficulties in maintaining social functioning; or*
> *3. Marked difficulties in maintaining concentration, persistence, or pace; or*
> *4. Repeated episodes of decompensation, each of extended duration.*

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective Aug. 12, 2015 to May 23, 2016) (emphasis added).

Listing 12.10 is satisfied when the requirements in both subparagraph A and B are met:

> A. Medically documented findings of the following:
> > 1. For autistic disorder, all of the following:
> > > a. Qualitative deficits in reciprocal social interaction; and
> > > b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity; and
> > > c. Markedly restricted repertoire of activities and interests;
> > OR
> > 2. For other pervasive developmental disorders, both of the following:
> > > a. Qualitative deficits in reciprocal social interaction; and
> > > b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity;
> *AND*
> *B.* Resulting in *at least two of the following:*
> > *1. Marked restriction of activities of daily living; or*
> > *2. Marked difficulties in maintaining social functioning; or*
> > *3. Marked difficulties in maintaining concentration, persistence, or pace; or*
> > *4. Repeated episodes of decompensation, each of extended duration.*

Id.  (emphasis added). Subparagraph B of listing 12.10 requires a consideration of the identical factors that the ALJ considered in analyzing subparagraph D of listing 12.05. Thus, the ALJ's analysis of the factors in subparagraph D of listing 12.05 applies equally to a consideration of subparagraph B of listing 12.10.

The Court finds that the ALJ's conclusion that the requirements of subparagraph D of listing 12.05 (and therefore subparagraph B of listing 12.10) had not been met is supported by

substantial evidence. The ALJ's finding that Kaelen has only a mild restriction in activities of daily living is supported by substantial evidence. As noted above, in making this finding, the ALJ observed that Kaelen can take care of her personal needs although she is unable to obtain a driver's license. R. at 21. Indeed, the testimony by Kaelen and her mother Kathleen, along with the Function Reports they filled out, show that Kaelen can bathe, dress, make simple meals, feed herself, and take care of pets.

The ALJ's finding that Kaelen has moderate difficulties in social functioning is supported by substantial evidence. In making this finding, the ALJ concluded that although she displays anti-social behaviors, Kaelen gets along well with her mother and friends. R. at 21-22. Indeed, Kaelen testified that she is "pretty good at making friends and [she is] well liked." Although she sometimes argues with her friends, she explained that they "always make up in the end." According to the testimony given by Kaelen and her mother Kathleen, as well as the Function Reports they filled out, Kaelen goes out to the movies and conventions with her friends, she has conversations with her friends, and she goes out to restaurants with her mother and her friends.

The ALJ's finding that Kaelen has moderate difficulties in concentration, persistence, or pace is supported by substantial evidence. In making this finding, the ALJ observed that although she has difficulty following direction and finishing what she starts, Kaelen is also able to spend all day playing video games with long complex stories. R. at 22. This finding is consistent with notes from Dr. Fowler's psychological examination, where he observed that Kaelen was able to understand his instructions and work at a steady pace with good attention and concentration and sustained persistence. R. at 278. In 2012, Hattier/Dr. Matson similarly observed that Kaelen followed instructions and was able to persist when presented with difficult items. R. at 226.

The ALJ also correctly found no evidence that Kaelen has experienced any episodes of decompensation. R. at 21-22.

Further, as pointed out by the Commissioner, the state agency psychologist Dr. Lochner reviewed Kaelen's records and found her impairments did not reach the requirements of listing 12.10. As noted above, Dr. Lochner concluded that Kaelen had mild restriction of activities of daily living; moderate difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation with extended duration.

Accordingly, the Court finds that the ALJ's finding that Kaelen did not meet the requirements of Subparagraph D of listing 12.10 is supported by substantial evidence. Because listing 12.05 requires the same factors be satisfied, the Court finds that substantial evidence also supports a finding that listing 12.05 has not been met. Although the ALJ did not explicitly analyze Listing 12.05, the ALJ's conclusion that Kaelen does not have an impairment or combination of impairments that meets one of the listed impairments is supported by substantial evidence. Accordingly, the error is harmless and reversal is not warranted.

Issue No. 2.    Whether the ALJ erred in finding that claimant has received very little treatment for mental impairment in recent years.

Kaelen seems to challenge the ALJ's observation that Kaelen had limited treatment in recent years for her mental impairments in assessing Kaelen's residual functional capacity. Kaelen points to the therapy she received in 2004 with Mercy, and she says she received treatment with TAC and Magnolia from 2005, as well as Options for Independence. She admits that as of 2013 she did not obtain medical treatment, but says this is because psychotherapy appointments and health insurance were not affordable. She insists that the psychological evaluations were not "for

the purpose of getting disability benefits," but were instead performed to request educational modifications.

The evidence cited by Kaelen does not contradict the ALJ's observation that in recent years (2013 through 2016), Kaelen had not received treatment for her mental impairments. The ALJ's note that one of the psychological examinations was for the purpose of obtaining disability benefits is correct—Dr. Fowler's examination was performed as part of the disability determination analysis by the state agency.[4] Further, in making her residual functional capacity assessment, the ALJ observed that not only has Kaelen received minimal treatment since March 19, 2014, when she filed her application for disability benefits, but the evidence documents improvement. The ALJ noted that Kaelen finished high school with As and Bs in all subjects but math, Kaelen is attending college classes, and she tests within the average range for intellectual capacity. The ALJ also noted Kaelen had an organized and articulate presence at the hearing and was particularly candid about her limitations.

Kaelen may be complaining that the ALJ did not consider the 2016 evaluation of Dr. Guidry, which was not performed until shortly before the ALJ's decision and was not considered by the ALJ. The Court notes that the Guidry evaluation was considered by the Appeals Council in denying Kaelen's appeal. Further the Court finds that the psychological evaluation of Dr. Guidry would not change the ALJ's assessment of Kaelen's residual functional capacity. Like the Hattier/Matson evaluation, Dr. Guidry concluded that Kaelen scored high/probable for a diagnosis of Asperger's and diagnosed Kaelen with Autism Spectrum Disorder. Dr. Guidry classified Kaelen as Level 1 for Social Communication, which corresponds with noticeable impairment in social

---

[4] The two evaluations that Kaelen refers to are the 2012 evaluation by Hattier/Matson, which was considered by the ALJ, and the 2016 evaluation by Dr. Guidry, which was considered by the Appeals Council, but was not before the ALJ.

communication; difficulty initiating social interactions; atypical responses to social overtures; and decreased interest in social interactions. Dr. Guidry also classified Kaelen at Level 1 for restricted repetitive behaviors, which corresponds with "inflexibility in behaviors causes significant interference with functioning in one or more areas; problems of organizing and planning hampers independence." As noted above, a Level 1 classification is associated with "requiring support," while a Level 2 classification requires "substantial support," and a Level 3 classification requires "very substantial support."

The ALJ's residual functional capacity analysis incorporated limitations to address Kaelen's concentration and socialization impairments. The ALJ required that Kaelen be limited to performing simple, routine tasks commensurate with an SVP level of two or less, with no more than occasional changes in work setting or routine, no more than occasional interaction with co-workers or supervisors, and no interaction with the public. Kaelen has pointed to no evidence that would result in the conclusion that such limitations are insufficient. Indeed, Kaelen and her mother both testified that Kaelen would likely be able to perform a simple job with clear instructions if she did not have to interact with people. R. at 51, 60.

Issue No. 3.    Whether the ALJ erred in finding significant jobs available for claimant without consideration of claimant's argument that she cannot live on her own and cannot drive, limiting her ability to travel for work.

Kaelen argues that while jobs may be available nationwide, the ALJ and the vocational expert failed to "take into consideration that at this time, any work [Kaelen] would be able to do would not afford her to live by herself, away from her parent." She points out that she does not drive and insists that she needs her mother's assistance to pay bills.

But as the Commissioner points out, consideration of whether jobs are available in the local area is foreclosed by the regulations, which explain that a person is not disabled if "if [claimant's] residual functional capacity and vocational abilities make it possible for [claimant] to do work which exists in the national economy" even if claimant remains unemployed due to an inability to get work, lack of work in claimant's local area, hiring practices of employers, technological changes in the industry, cycling economic conditions, no job openings, whether claimant would actually be hired, or claimant's desire to do a particular job. 20 C.F.R. § 404.1566. Indeed, the Fifth Circuit has recognized that

> This tactic is foreclosed by 20 C.F.R. § 404.1566(c) which specifically excludes the lack of work in the local area, employer hiring practices, cyclical economic conditions, and the absence of job openings from consideration in determining an individual's work capacity.

Harrell v. Bowen, 862 F.2d 471, 479 (5th Cir. 1988). The vocational expert listed the following examples of work that a person with Kaelen's age, education, and lack of work history, along with the residual functional capacity supplied by the ALJ, could perform:

> (1) [mail clerk] DOT reference 209.687-026, which has an SVP of 2, light exertion level, with 422 jobs on the state level and approximately 69,000 nationally;
> (2) sorter, DOT reference 521.687-086, unskilled occupation with SVP of 2, light exertion level, with 1,400 jobs on the state level and 127,000 on the national level; and
> (3) hand packer, with DOT reference 753.687-038, unskilled occupation with SVP of 2, light exertion level, with 1,900 jobs on the state level and 315,000 on the national level. R. at 62-63.

As noted by the Commissioner, the Fifth Circuit has affirmed a finding that 50,000 jobs available nationally was sufficient to support a finding that claimant was not disabled. Lirley v. Barnhart, 124 F. App'x 283, 284 (5th Cir. 2005).

The Court finds that ALJ's step 5 determination that there are jobs available that Kaelen could perform is supported by substantial evidence.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 10) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 11) be GRANTED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 9th day of May, 2018.

Janis van Meerveld
United States Magistrate Judge